SWEET & CARPENTER v. CHARLES T. JAMES.

ALLEN SHAW v. CHARLES T. JAMES.

An appeal from a decree of the Court of Common Pleas, rendered upon a master's report in proceedings under the " act securing to mechanics payment for repairs and improvements by them made on real estate," does not vacate the decree by which the lien is declared and the master appointed, but only the decree establishing the master's report, and the only matters opened by the appeal are those raised by the exceptions to said report.

The lien provided by this act is not confined to mechanics, but is extended to all persons, who have made repairs or improvements upon the estate of another under contract with or at the request of the owner.

The contractor, who has made repairs and improvements upon the estate of another, is entitled under the act to a lien upon the estate, not only for his own personal labor, but for the labor of all employed by him in

Sweet & Carpenter *v.* James.

such repairs or improvements notwithstanding their concurrent lien, and the only effect of the enforcement of the lien on their part would be to diminish the lien of the contractor *pro tanto.*

To entitle the contractor to a lien for labor furnished, it is immaterial whether all the labor is performed on the estate or in the workshop or elsewhere, if it finally goes into the repairs or improvements contracted for.

The lien for materials extends only to such materials as are furnished by the person who furnishes labor and which are used in the work which he is employed, to do ; but for materials supplied by him for other work, though upon the same building, he stands simply as a material man and and is not entitled to a lien. But, whatever may be the condition of the materials furnished, whether very rough or perfectly adapted for their purpose, and in whatever quantities or from whomsoever they may have been originally purchased, or although kept by the contractor as merchandize, his lien is not affected by these considerations, provided only they are incorporated in the work contracted for.

For all the work done under a single contract or request, the contractor is entitled to but one indivisible lien, and must file his notice within six months after the commencement of the work, or the lien is entirely lost ; but, when work is done under several contracts or requests, each separate job is entitled to a separate lien, or the lien is divisible, so that where notice has been filed, embracing an account for work extending back more than six months, that portion of the work which has been done within the six months will be protected, and the portion done prior to that time will be unprotected.

The taking of a negotiable promissory note or draft from the debtor, on account of a pre-existing debt, is not a payment or discharge of such debt ; but the actual negotiation of such an instrument raises a presumption that the parties intend it as a discharge of the debt, but such a presumption is *prima facie* only, and is open to be rebutted by evidence to the contrary, and the fact, that a lien is to be given up or security for the debt lost or abandoned, is a fact raising a counter presumption and rebuts that arising from the negotiation.

When a negotiable draft had been given by the respondent for a portion of the charges, embraced in the account filed in the Clerk's office with the notice of lien, and had been discounted and was outstanding in the hands of the bank at the time the notice of lien was filed, but arrived at maturity and was taken up by the petitioners and remained unpaid at the time the petition for the enforcement of the lien was filed ; *held,* that the petition to the Court and not the notice filed in the clerk's office was the commencement of the action to enforce payment, and said draft being due and unpaid at that time was no bar to the recovery of the debt on account of which it was given.

Exceptions to a Master's report. The report was made at the May Term, 1852, of the Court of Common Pleas, in conformity with a decree of said Court, passed at the December Term, by which it was decreed, that the petitioners had a lien upon certain real estate of the respondent, for repairs and improvements thereon, and John P. Knowles was appointed Master to ascertain the exact nature and amount of such claims on said property, &c. The account of Sweet & Carpenter, annexed to the notice of lien filed in the City Clerk's office September 12th, 1851, embraced charges commencing March 14th, 1851, and coming down to September 12th, 1851, and amounting to $5,211 02. The Master reported, that said Sweet & Carpenter were master housewrights or master carpenters, prosecuting business extensively, and employing a large number of journeymen, but no apprentices. Their claim was for work done and materials furnished for the estate aforesaid, at the request of the respondent; but there was no proof of any express contract, except that one of the petitioners was told by the respondent to go on and repair the house, and, when he wanted any money, to call upon the respondent's clerk for it. None of the labor charged was done by either of the petitioners, but all by their journeymen. It was admitted by the respondent, that the work was done and the materials supplied as charged, that the prices were reasonable, and that the petitioners had paid for the work and materials, and the bills of tradesmen and artizans, as charged. The account comprised charges for three classes of labor : *first*, for labor of the journeymen employed by the petitioners; *secondly*, for labor performed in drying and planing lumber, and for turning and carting, which was assumed by the Master to have been performed upon materials protected by the lien; *thirdly*, for the labor of workmen,

originally set at work by James C. Bucklin, the respond-
ent's agent, and afterwards taken under the direction of the
petitioners and paid by them, upon the suggestion of said
Bucklin that it would be best so to do, and charge it in their
account. Besides the charges for materials, which were not
disputed to be within the lien, there were charges: *first,*
for articles ready made, such as sash, blinds, locks, screws,
&c., purchased of artizans and tradesmen to be used in
the improvements; *secondly,* for work done and materials
furnished by a sheet iron worker at the request of the pe-
titioners and upon their credit; *thirdly,* for articles fur-
nished from the shop of the petitioners, some of which
were there manufactured purposely to be used in the re-
pair of the respondent's house, and some of which were
kept on hand as articles of merchandise.

In ascertaining the amount for which the petitioners
were entitled to a lien, the Master made the following
rulings, viz :

*First.* The master mechanic, who furnishes materials
in his line of business and incorporates with them labor
done upon the premises improved, whether performed by
himself or by workmen hired by him, by the day, month
or year, if such work is done and materials furnished un-
der contract with or by request of the owner, is entitled
to a lien for them ; as, also, for labor done upon an article
made in his work-shop, but with the view to its being an-
nexed to the estate, and actually so annexed.

*Second.* For labor done and materials furnished by a
sheet-iron worker, at the request of a master carpenter and
upon his credit, and paid for by him, such master carpen-
ter is not entitled to a lien, unless it be shown, that the
owner of the estate had contracted with the carpenter to
perform or cause to be performed a sheet-iron worker's
labors, and be also shown, that, in the view of the law,

whoever contracts to do or cause to be done a mechanic's work, is to be regarded *pro hac vice*, at least, as a mechanic.

*Third.* For materials supplied by the master mechanic, which are in fact articles of merchandise, which are by him kept on hand for sale, or which are purchased by him of dealers therein, and upon which no labor, or but a trifling amount, is bestowed with especial reference to their adaptation for, and annexation to, the particular estate charged, he is not entitled to a lien, notwithstanding he has paid for those materials, and has indisputably a lien for labor and other materials upon the same estate.

The respondent claimed, that credit should be given in the account for two payments. One of these was by the respondent's acceptance of the draft of the petitioners upon him, payable to their order, for $800, in four months from May 10th, 1851, which acceptance the petitioners procured to be discounted at the Eagle Bank, Providence, whose property it continued to be until September 25th, 1851, when the petitioners, as endorsees or drawees, took it up. The petitioners offered the acceptance to be impounded, and claimed that, as they were compelled to take it up, they were not bound to credit it. The Master ruled that it should be credited in account as payment *pro tanto.*

As the decision of the master in regard to the other payment was not excepted to, it is unnecessary here to state the facts.

The account, in the case of Allen Shaw, annexed to the notice of the lien filed in the City Clerk's office September 4th, 1851, embraced charges between the dates of January 4th and August 26th, 1851, though the petitioner made no claim upon the charges prior to the 4th of March. The Master reported that the petitioner, Shaw, was a mechanic, by trade a painter, who prosecuted the business

of a painter, in connexion with the cognate branches of glazing and paper hanging, and also kept a store or shop stocked with all the materials, paints, oils, window glass, putty, brushes, varnishes, &c., which painters and glaziers have occasion to use, which materials he kept for sale and did sell, in whatever quantities called for, to all who would purchase, to be used by them when and where they pleased. The labor charged in the account was performed wholly by his one apprentice and by hired journeymen, he simply visiting the premises at times to look after the men. The articles charged were carried and taken by the petitioner and his servants or sent by a drayman from the shop of the petitioner to said premises and there used, being charged as sent or carried, and the portions, if any, not used, returned to the shop and credited, or the original charge modified.

The respondent contended, that the petitioner's claim should be rejected, because the notice was not filed within six months of the commencement of the account. But the master overruled the objection, on the ground that he was bound by the decree determining that the petitioner did have a lien, and because the work consisted of a series of jobs, performed, not under a single entire contract, but at different times, as they were required; and, as they were therefore each entitled to a separate lien, so much of the claim as fell within the six months, might well be secured, although the rest must be rejected. On ascertaining the amount for which the petitioner was entitled to the lien, the master allowed the charges for labor, but disallowed the charges for articles sent to be used in the repairs.

Exceptions were filed to the report of the master by the petitioner and the respondent in both cases. In behalf of Sweet & Carpenter, it was excepted as follows:

1st.  For the disallowance of the charges for materials, purchased ready made of tradesmen and artizans and used in the improvements on the respondent's estate.

2d.  For the disallowance of the charge for the payments made to the laborers, originally employed by James C. Bucklin.

3d.  For crediting in their account eight hundred dollars, on account of the acceptance of the respondent.

The respondent in the same case excepted to the report, because the master allowed for the work and labor of journeymen, who were exclusively hired by and worked for and credited the petitioners, and because he allowed the charges for planing, carting and turning lumber, &c.  He also excepted because the master did not report that the sale of land to satisfy the lien should be subject to a mortgage by said James to the Blackstone Canal Bank, dated July 26th, 1851, and a mortgage to George W. Chapin, for himself and as trustee for others, dated August 1st, 1851.

In the case of Shaw v. James, the petitioner excepted because the master disallowed the charges for the materials used by his workmen in the reparation of the respondent's house.

The respondent excepted because the master overruled the objection that the account filed in the city clerk's office, September 4, 1851, and, with petition, commenced January 4th, 1851, not within six months after the commencement of the work as required by the act, and because it is not competent for a party to waive a claim for a portion of his account, and claim only for so much as may fall within the notice—especially where the work was such as in this case—nor can this be done as against the mortgagees on said estate, the Blackstone Canal Bank, whose mortgage was executed July 26th, 1851, and

George W. Chapin, whose mortgage was taken August 1st, 1851, at which times more than six months had elapsed since the commencement of said work ; and because the master did not report that the sale should be subject to the aforenamed mortgages.

Upon the coming in of this report and the exceptions, the Court entered the following decree, viz :

" The plaintiffs' exceptions to the master's report are overruled, and the defendant's exceptions are sustained and it is therefore decreed by the Court, that the defendant is not indebted to the said Allen Shaw and that he, the said Shaw, has no lien upon the estate named in his petition, and that the defendant is indebted to the said Sweet & Carpenter in the sum of one dollar, for the payment of which the said Sweet & Carpenter have a lien upon the estate named in their petition." And John P. Knowles was appointed to make sale for the payment of the same.

From this decree the petitioners appealed. Previous to the hearing, the question arose whether the appeal entirely vacated the proceedings below, and left the case open to the jury. Upon this point the Court held, that the only appeal under the act was given by the 18th section thereof, and that, construing that section in connection with the 12th section, it was evident that the preliminary decree establishing the fact of the lien was conclusive, and that the only matter opened by the appeal was the decree of the Court ascertaining and marshalling the claims against any property, or the decree of said Court accepting the report of any master ascertaining and marshalling such claims.

*Potter* for the respondent contended. The present act was designed to remedy the evils, growing out of the

general lien given by the preceding, and a comparison of its title and provisions with those of the preceding shows that it should be restricted to mechanics, in the strict sense of the term, and care should be taken not to extend by construction its benefits to men of other classes.— Under the former act, almost every variety of labor or materials employed in improvements upon real estate were protected by a lien, available to every class of persons by whom they were furnished. Thus claims of every description became a lien upon real estate. The design of this act was to secure to mechanics simply, the same lien upon improvements made upon real estate, as was secured by common law upon articles manufactured by artizans in their workshops. The old act secured lumber-men ; in this they were excluded. Yet, if this act is construed to secure the contractor for lumber purchased, they may work out indirectly through him the lien from which they are directly excluded. They have simply to enter into association with the mechanic to furnish the lumber through him, and the lien, which is nominally his, protects them as substantially as the lien directly conferred upon them by the former act. But even if the Court will not restrict the act so much as this, it will not certainly construe it to protect articles which are purchased of dealers ready made, such as sash, blinds and doors, and which are not materials to be wrought into the construction by labor performed upon the estate, but parts of the construction, made elsewhere and sold and which need not be parted with until the price is paid. These are not like materials worked up upon the estate and, but for the lien, passing out of the hands of the artificer, with every nail that is driven and every joist that is fitted.— The labor must be performed upon the estate or it gives no lien, either for work or materials. By this act two

classes of workmen are protected, the principal contrac-
tor and the sub-contractor, both are entitled to a separate
lien for their work done, and, therefore, the lien of each
is a personal privilege and must be restricted to the work
done and the materials furnished by each.    If the princi-
pal contractor is to have a lien for the labor of his em-
ployees, two liens for the same work might exist concur-
rently upon the same estate, and would lead to inextri-
cable difficulties.    As to the laborers employed by Buck-
lin and afterwards given into the charge of Sweet & Car-
penter, they were not mechanics and did not do a me-
chanic's labor, and, not being themselves entitled to a lien,
no one else could derive a lien through them.    In regard
to the eight hundred dollar note, he contended the Court
had already decided that a note so taken and negotiated,
was *pro tanto* a waiver of the lien.

As to the claim of Shaw, he contended that the pe-
titioner was not a mechanic, but a trader, who did not
himself do any work and had no direction of the men, for
hiring whom he charged a commission, and that the ma-
terials for which he claimed a lien were articles of mer-
chandise, sold in his line of business as a trader.    That
the lien never attached, the notice not having been filed
until after more than six months from the commencement
of the account, and there was no proof that the work
consisted of a series of jobs for which the lien might be
waived on that portion done more than six months pre-
vious.    The notice is a record and cannot be altered after
it is filed ; and, if the whole account is not filed, yet a
purchaser or mortgagor may know the fact, that the work
commenced more than six months before, and act upon
his personal knowledge, and such a lien must therefore
be postponed to the intervening mortgages.    He also con-
tended that if the decree of the Court below was conclu-

sive upon the question of lien or no lien, the petitioners were barred by the final decree in this case.

*Bradley* for Sweet & Carpenter and *Jenckes* for Shaw contended. The lien for labor is not limited to each man for his own labor, but for " labor furnished." One man may furnish the labor of a thousand and he has his lien for it and it is immaterial whether or not he is a mechanic if he furnishes mechanical labor. In this case the laborers have been paid, so that there is no conflict of concurrent liens. If such a case should arise, the Court might compel the payment of the laborers before enforcing the contractor's lien. The lien for materials is not restricted by the act to materials worked into the house upon the place. It embraces all the work done and all the materials used. The test is simple by which articles protected by the lien are distinguished from articles not protected.—Were they delivered simply as articles sold to be used at the purchaser's pleasure, or were they furnished in consequence of a contract, either express or implied, to make a certain improvement, in which the articles were to be used and were in fact used. If they were simple articles of merchandise they were unprotected ; if used as materials they were protected. In the case of Shaw the defendant never bought a barrel of paint or of oil, simply as such, but as they should become in the forms which they assumed under the hands of the workmen. If you distinguish between materials in different states of preparation, where will you draw the line ? What article is there which derives its sole value from the work done at the place where it is used ? Bricks, morter, boards, joists, are not simple material, in the narrow sense, but have acquired a value and a fitness for the purposes for which they are used by labor previously expended. Carry out

the view of the respondent and you give a lien for labor simply.   As to the objection, in the claim of Shaw, that the notice was not filed within six months, this was a defence to the issue of lien or no lien, which is not now open to controversy.   Any defence which goes to the whole account should be taken in the preliminary preceding.   But this work was a series of jobs, each separate and distinct, and each giving a right to a lien, and therefore a portion of them might be waived.   The filing of the claim is not notice of the amount, but simply of the fact that there is a lien.

To show that the eight hundred dollar acceptance though negotiated, yet being now delivered up to be impounded in Court, was not a waiver *pro tanto* of the lien, the following authorities were cited :   (2 Am. Leading Cases, pp. 185-196.)   *Curtis* v. *Hubbard*, (9 Met. 328. 2 U. S. Dig. p. 780, § 45.   2 Sup. U. S. Dig. p. 339, § 69.   p. 341, § 102.)   *Gogel* v. *Gale*, (7 *Blackf.* 218.) *Jones* v. *Alexander*, (10 Sm. & Marsh. 627.   2 Annual Dig. p. 256, § 13.   4 Annual Dig. p. 311 § 24.)

BRAYTON, J., delivered the opinion of the Court.

The act, under which the lien sought to be enforced in this cause is claimed, was passed in January, 1847, and is entitled " an act securing to mechanics payment for repairs and improvements by them made on real estate."

Section 1, provides that ; " Whenever any building, turnpike, railroad or other improvement shall be constructed, erected or repaired by contract with or at the request of the owner thereof, such owner being at the time the owner of the land on which the same then is, such building, canal, turnpike, railroad or other improvement, together with the said land, is hereby made liable and shall stand pledged for all the work done in the construction,

erection or reparation of such building, canal, turnpike and other improvement, and for the materials used in the construction, erection or reparation thereof, which have been *furnished by any person*, who had *contracted* or been *requested* as aforesaid, to construct, erect or repair the same, before any other lien which shall originate subsequent to the commencement of such erection, construction or reparation on said land."

The questions raised, are made upon the report of the master, appointed by the Court of Common Pleas to ascertain the amount and marshal the respective claims.

Section 12 of the act provides that ; " If it shall appear to the Court by default, confession or on trial, that the petitioner or any other person, party to the proceeding, claiming to have a lien on said property or any part thereof by virtue of this act, had any legal claim against the same at the time of filing said petition or of becoming party to the proceeding, said Court shall by themselves or by a master by them appointed for that purpose, proceed to ascertain the exact nature and amount of each claim on said property or any part thereof," and, " the order in which, according to equity and good conscience, they should be paid out of said property and how much of said property and especially how much if any and what portions of land under and adjoining the same, subject to sale by the provisions of the act, shall be sold to satisfy the same."

Section 18 provides that ; " Any person aggrieved at any decree of the Court ascertaining and marshalling such claims, may appeal therefrom to this Supreme Court."

Under the provisions of this last section, the master's report in this cause is brought before this Court. This is the only portion of the act providing for an appeal.

Sweet & Carpenter & James.

In the opening of the cause, the defendant's counsel interposed an objection to the consideration of the report and claimed that the appeal vacated all the decrees and judgments of the Court of Common Pleas, the order appointing the master as well as the decree upon the report, that the whole case was here open, the question of lien or no lien, as well as the decree ascertaining the amount and order of payment. The Court were not then able to coincide with the counsel in this view of the law and held, that the only question, brought here for adjudication by the appeal, was that upon the master's report, and the only decree vacated by the appeal were those rendered upon it.

The difficulty which we encountered in coming to any other conclusion is that, while the act provides no other appeal, it expressly gives an appeal from these decrees, thereby impliedly negativing the idea of any appeal for any other matter. It is evidently the design of the act, that these questions should be brought directly and distinctly to this Court from the Court of Common Pleas. Now, if the report itself is to be set aside by the appeal, the question submitted to that Court could never be the subject of adjudication here. We could never consider the report of that master, but must necessarily pass a fresh interlocutory decree that there existed a lien and thereupon appoint a master here and act upon his report.

Now, we think the act contemplated no such action of the Court, and that, therefore, the only questions, which can be considered here, are those arising upon the report of the master appointed by the Court of Common Pleas. What might have been the effect if an appeal had been claimed before the reference to a master, it is not necessary now to say.

The questions, which are properly before us, are raised

Sweet & Carpenter v. James.

by the exceptions to the report of the master filed by the parties.

The respondent's exceptions are ; *First*, that the master allows for the work of journeymen and others employed and paid by the petitioners. The law gives such persons a lien as sub-contractor. *Second*, that the master allowed charges for teaming, carting, planing, lumber, &c.

The petitioner excepts to the report ; *First*, that the master disallowed certain charges for materials by them furnished for the building of the defendant, which they purchased and fitted for and placed upon said building. *Second*, that the master disallowed certain charges for labor done upon said estate by certain persons, originally employed by one James C. Bucklin as agent for the defendant, and which were afterwards placed by him under the care of the petitioners and by them employed in the work and by them paid.

The petitioner, Allen Shaw, excepts to the report, That the master disallowed the charges for materials used by the workmen of the petitioner in doing the work for which the lien is claimed, the materials being used in the construction, erection and reparation of the defendant's building, &c.

These exceptions raise the question as to what persons are entitled to a lien within the provisions of the first section of the act, and the subject matter for which a lien may be claimed ; in other words, *first*, what labor, and, *second*, what materials, are protected by the act. ·

Who is entitled to a lien under this act ? It appears by the report of the master that the petitioners, Sweet & Carpenter and Allen Shaw, are mechanics, and therefore if it were necessary that the party, claiming a lien, should follow such occupation, would be entitled to a lien for the work done by them respectively.

In order to determine the various questions raised by the exceptions, it is necessary to give a construction to the first section of this act and determine who are entitled to its protection and to what extent.

The act no doubt originated in a design to protect and secure mechanics, in the proper sense of that term, and to secure to them payment for their *labor*. It was its primary object, and for that reason the term mechanic is used in the title of this act, as well as in the former act of 1834, upon this subject. The body of the act wholly omits that term and declares the estate "pledged for all work done" and "for the materials used," "which have been furnished by *any person* who had *contracted or been requested* to construct, erect or repair," and gives a lien too for all such work done upon canals, turnpikes and railroads, as well as upon dwelling-houses and other buildings. Now, it is apparent, that the construction of a turnpike would call for very little labor commonly termed mechanical or indeed, if any distinction is to be made between that and other labor, would give a lien for a very small portion of the improvements made by a contractor.

We take the case of a turnpike, because the great portion of the work required for its construction is mere digging and grading, and such as must be done by mere laborers. If the whole were done by contract, it would not require, nor should we naturally expect the contractor to be a mechanic, but it is evident that such contractor was designed to be protected as much as the housewright or the mason.

Besides practically mechanics strictly so called, who pursue a particular occupation, are protected mainly, they being the persons usually employed, and so derive all the protection designed for them, but in view of the provisions of this act they are not exclusively within the protection of the act.

It was evidently the intent of the act that while mechanics were secured for their labor, all other persons who had contracted or been requested to make repairs and improvements upon the real estate of another should also be protected.

The only question in all this case as appears to us must be—did the claimant contract for the work or was he requested by the owner of the estate to do the work, for which he claims lien and has he furnished it?

Then is he entitled to a lien for any more than his own personal labor? The act declares that the estate shall stand pledged for all work, done in the construction and, repair, which shall have *been furnished* by any person, who has *contracted* or been *requested to construct or repair*, and so pledged, " whenever any building, &c., shall be erected or repaired by contract with or at the request of the owner." The legislature must have contemplated, and the act from these terms evidently does contemplate, a contract for the erection and entire construction of buildings, turnpikes, &c., and a contract for the entire work from the foundation of a dwelling or ware house to its completion in all its parts. To do the entire labor would be impossible and beyond the strength of a single individual, and, if it were possible, could not be accomplished in any reasonable time. He must necessarily furnish labor in addition to his own work, to render his own of an essential service to his employer, and the act provides a security to him for it.

A contract to erect and complete a dwelling house would require the labor of many different persons of different mechanical pursuits, the house-wright, the painter, mason, paper-hanger, gilder, &c. The contractor would not combine all these, yet he is employed to do the work of all and each of them, and, it may be, even of a sheet-

iron worker.   If the contract be for improvements, which require for their completion such or any other kind of work, he would be bound to furnish it, and it would equally become part of the improvement for which he contracted.

Neither does it furnish any argument against this view of the provision of the act, that a lien is given to the journeymen or other laborers employed by the original contractor.   This is a right entirely subordinate to that of the contractor.   They do not contract with the owner of the estate and acquire no right of action at common law against him, but only against their immediate employer.   The contractor has his election to bring his action at law or proceed by petition to enforce the lien.— They have no such election as to the owner of the estate. They may, however, decline trusting entirely to the solvency of their employer and look to the estate.   But in that case they proceed against the estate only and not against the owner.   The effect of such a proceeding on their part would be to diminish the lien of the contractor *pro tanto*.

Neither is it material, whether all the labor is performed upon the estate or in the workshop or elsewhere, if it finally goes into the work contracted for, and the title of the act we think expresses the general intent in this respect—" an act securing to mechanics payment *for repairs and improvements made upon real estate.*"   The labor, wherever done, equally becomes part of the repairs and improvements made upon the estate.   The labor upon the material before it is annexed, becomes part of the labor of improvement when annexed.   The question in such case is, did the contractor procure the labor for which he charges on his own account, at his own expense, and in the prosecution of the work contracted for or requested to be done.

Whoever has a lien for work done, by the provisions of the act, has also a lien for materials. But what materials? The statute says, "for the materials used in the construction, erection or reparation which have *been furnished*" by any person who had contracted, &c. ; and, the first question which naturally suggests itself is, whether there is any material actually used in the construction and furnished by him for which he has no lien,—was anything intended to be excluded?

The practical construction of the act of 1834 giving a lien was, that it provided for everything, which was used or went into the building, by whomsoever furnished or supplied. It provides for material men, tradesmen, dealers in merchandise, who furnished no labor and contracted for none, as well as for the builder and laborer. They are excluded from the provisions of this act, and, so far as the lien goes, this constitutes the principal difference between that act and this. The act was designed to and does exclude mere material men. And, in the construction of the act, in order to give effect to that exclusion, the materials, which fall within the provisions of this act, must be taken to be such as are furnished by the person who furnishes labor, and must be intended for the work contracted for or requested to be done. As to all other work though upon the same building, he stands simply as a material man supplying materials for work, which he is not employed to do or have done and as to which he is a mere stranger. They must be furnished for the work which he is employed to do and be used therein.

Is there any reason for excluding any of the substances or things furnished by him and which, when put together by him, go to make the building? Has one kind of material a preference over another, or are they not all equally a part of the entire structure and necessary to its per-

fection ? They are usually purchased by the builder, and in the present state of the country and of trade and business, some must be purchased by him, such as boards, timber, shingles, clapboards, nails, &c., many of them, in a very rough state, all of them more or less improved from their original condition. The nail is made perfect from the iron and requires no further labor upon it for use ; and, so of screws and locks ; and from the great improvements in modern days and the more extended subdivision of labor, we find other materials for dwelling-houses in a state still more nearly prepared for annexation ; we find the original rough material brought into the shape of sash, window frames, blinds and other parts of a dwelling, and ready with but little labor to take their place in the structure ; but they are still materials. The results of the labor of one mechanic are becoming more and more the materials for the labor of another. They cease to be such only when incorporated into the building by the builder. In effecting this, it makes no difference what is the amount of labor or whether it is bestowed in adapting the materials to the building or the building to the materials ; and because it is impossible to define any precise state in which they shall be furnished, we are obliged to say that they may be furnished in any state in which they can be put in and made part of the structure. The owner is not injured by this. His building is sooner completed and the cost is no more than if it were wrought by the builder wholly out of the roughest possible materials.

It is of no consequence of whom they are purchased or procured and in what quantity originally, as the contractor is protected but for a single cask or even pound of nails, if he furnish no more, though he may have purchased and have had on hand a hundred, and though he

is in the habit of selling to others. The moment we enter into the inquiry, whether they are articles of merchandize, we shall find that all his materials are such in any state in which he can have them. If we say he shall have no lien for such as he keeps for sale, we debar him from selling at all, when it is most convenient for him and most for the benefit of the employer. It seems to us to be sufficient that the contractor does furnish the material at the request of the owner, without regard to the manner or quantity in which they were originally acquired.

With these views of this act, we will proceed to dispose of the master's report. The defendant's first exception, that the master allowed for the work of journeymen and other laborers, procured by the petitioners in the prosecution of the repairs and improvements made by them, must be overruled, as well as the exception to the allowance for planing and carting lumber, and the master's report confirmed in these respects ; the labor, here charged, having been performed in the prosecution of the repairs requested and having been furnished by the petitioners.

The exception of the petitioners, Sweet & Carpenter, that the master disallowed the charges for materials, furnished by them but purchased of others, must be sustained, these materials having been purchased by the petitioners and used in the repairs made by them.

As to the second exception, that the master disallowed for labor of persons originally employed by defendant's agent and paid for by the petitioners, it does not clearly appear, whether these laborers were in fact taken into the employ of the petitioners, with a right to look to them for their pay and a right of action therefor, or whether such laborers were the creditors of the defendant and paid by

Sweet & Carpenter *v.* James.

the petitioners for convenience. In one case they have a lien for the amount and in the other, not, and the report must be recommitted for the master to determine this point.

The exceptition of the petitioner Shaw, that the master disallowed charges for materials used by his workmen in doing the work for which he claims a lien, must also be sustained, the materials having been furnished for repairs and improvements made by him upon the estate at the request of the owner.

Another exception taken by the respondent is necessary to be considered. It is the exception to the report of the master in favor of the petitioner Shaw, and the objection is that the petitioner, in taking the first steps in this proceeding by filing notice in the city clerk's office, filed an account which commenced January 4, 1851, more than six months prior to the notice, and that he cannot waive part of the claim for the purpose of bringing the residue within the time.

If it were not settled by the first judgment, which leaves only the nature and amount of the claim undetermined, that the plaintiff had a lien, the point now made would be open for consideration. We are disposed to consider it as if it were now open. The master ruled that he might receive a part of the claim, inasmuch as the charges in the account had no necessary connection one with another, and there was no evidence of any particular request in fact, the work not being done in pursuance of one contract or one request to do the whole work. The ground of his ruling was, that the account, appearing from its nature and the evidence, not to have been an entire undertaking but a series of jobs, the claim was not restricted to but one lien, but that every separate request was the basis of a separate lien, all of which were to be enforced

by this petition ; so that, if after having completed one piece of work and having neglected for six months to give the required notice, he is requested to do another, of which he does give notice *within six months,* though he may lose the first, the last would be secured. We see no reason, although the whole account be filed and a lien claimed for a whole, why, if these facts appear, the master or the Court may not reject the first and give effect to *the* last. We think, however, that the whole work done under one contract creates one lien, and that, to save it, notice must be given by filing an account in the clerk's office within six months from commencing the work under it, and the same reason would require *that all the* work done under one request should be deemed entire, and create and constitute one lien, requiring notice to be filed in the clerk's office within six months from the time when the first work is done in pursuance of it, in order to protect *any portion of it.*

In this case it appears that the work charged in the plaintiff's account was done and the materials furnished, not upon one request but upon many, made from time to time, as repairs were necessary or desired and the claim therefore divisible into several liens and the master was bound to give effect to all those to which the notice was applicable. This he has done and his report must be confirmed in that respect.

By the general rule of law, the taking a negotiable promissory note or draft of the debtor, on account of a pre-existing debt, is not payment or discharge of such indebtedness. If the instrument taken be payable on demand, it does not affect the original debt, the party being at liberty to sue at any time therefor, and is only required to deliver up the note before judgment. If payable at a future day, the right to sue for the original debt is suspend-

ed until the maturity of the note. It operates as an agreement not to sue until default be made in the payment of the note. The taking of the instrument on account of the debt operates as conditional payment, and the understanding of the parties is deemed to be that, if paid, it shall discharge the original debt and not otherwise.

The actual negotiation of the instrument produces no other effect than to suspend still further the right of the creditor to sue, until the instrument be returned to him unpaid. This is the result in the absence of any agreement of the parties otherwise. If so agreed by them, it may and will operate as absolute payment, and the original debt will thereby be absolutely discharged.

But there is another class of cases in the States of Massachusetts, Maine and Vermont, in which it is held that the taking of a negotiable instrument on account of a pre-existing debt is evidence of such agreement; that the fact that the instrument is capable of being negotiated by the creditor, raises a presumption that he intended that it should be a discharge of the original debt, and it is held, that the taking of such instrument is *prima facie* evidence of such intent. It, however, is not held conclusive evidence and the presumption, arising from that fact, is open to be rebutted by other evidence.

Shaw, C. J., in delivering the opinion in *Curtis & others* v. *Hubbard*, (9 Met. 329,) says, " this presumption of fact may be rebutted by evidence showing a different interest, and the fact, that such presumption would deprive the party of a substantial benefit, as that it would discharge a lien or other collateral security, would have a tendency to show that it was not so intended." The same remark substantionally is made in *Melledge* v. *The Boston Iron Company*, (5 Cushing, 158.)

Grier, J., in *Sutton et al.* v. *The Albatross*, (1 Am.

Law Reg. 87,) says, " where a creditor has two securities it will not be easily presumed that he has voluntarily released one of them and that the best of the two."

Now, although the rule adopted in Massachusetts as to the taking of negotiable instruments has not been adopted here, this Court having uniformly held, that the taking of such instrument neither discharges the debt nor raises a presumption of such intent, it has been held that the actual negotiation of the instrument does raise such a presumption and that it is *prima facie* evidence of such intent on the part of the creditor.

But it is *prima facie* only, and open to be rebutted by the same evidence and in the same way, as the same presumption raised from the taking of such instrument, when such presumption is held to arise. The fact that a lien is to be given up or security for the debt lost or abandoned, is a fact raising a counter presumption and rebuts that arising from the negotiation. The exception to the master's report on this point must be sustained.

The defendant claims that the master's report as to the eight hundred dollars, the amount of the draft, should stand, because, although negotiation of the draft was not payment of the debt to that amount, yet inasmuch as the draft, at the time of filing the notice and account in the clerk's office, was outstanding in the hands of the Eagle Bank, the petitioner was not then entitled to sue for the debt.

Lord Kenyon in *Stedman* v. *Gooch,* (1 Esp. 4,) says that, if in payment of a debt, a creditor is content to take a bill or note payable at a future day, he cannot legally commence an action for the original debt until such bill or note becomes due and default is made in payment. And in *Price* v. *Price,* (16 M. & W. 23) Park Baron, citing this remark says, " it expresses the whole law on this subject,

if taken with this additional proposition, that there can be no recovery on any cause of action for which a note or bill has been given, which is outstanding in the hands of a third person and of such a nature as to give him a right of action against the defendant."

But it is clearly sufficient, by the current of authorities, that the plaintiff has at the commencement of his suit the note or bill in his possession.    (16 M. & W. 231., 8 M. & G. 804, 15 John. 247.)

Section 4 of the act provides in relation to work and materials furnished under *written contract,* and requires that legal process for enforcing the lien shall be commenced within six months after any payment shall become due or the lien shall be wholly lost.

Section 5, provides for work and materials furnished *without written* contract, including such as may be furnished by express verbal contract or upon request merely, and in such a case, requires the process to be commenced within six months from the commencement of the work or furnishing the materials.

Section 7 provides what the process shall be for the purpose of enforcing the lien, and that it shall be the lodging the account or demand for which the lien is claimed in the office of the town clerk of the town, where the estate is situate, with notice to what estate it applies and whose estate therein.

Now, the act evidently pre-supposes that the lien claimed may be for money due and payable and for sums not due or payable at the time of commencing the process, and under the 5th section, it might happen that nothing were as yet due and credit may have been given by the terms of the contract beyond the six months, and under the fourth section some of the payment may not have fallen due.    But the party is not thereby excused from com-

mencing his process within six months, and he may commence it within one month or even less, for he is not restrained in that respect. So that the act contemplates the commencement of process to enforce a lien for money not due and for which credit may have been given beyond the six months. It is not absolutely necessary that at that time any money should be due.

A note given for the amount claimed or for any portion of it and which has not come to maturity would be no bar to proceeding, its effect being only to suspend the right of action in the case of recovery merely. In this case the suit must proceed. The claimant must at the next term of the Court of Common Pleas, next after the commencement of the first process, file his petition praying that the lien may be enforced, and that without regard to the time of payment.

But in regard to the first process, though it is called the commencement of legal process to enforce the lien, it is evident that the whole purpose and intent is to give notice of the party's claim upon the estate, as the record of a mortgage would, and, when it is called a process to enforce the lien, the terms are used rather in contradistinction to process to enforce *payment;* otherwise, the petition filed in Court is the only proceeding for that purpose. It is not until this is commenced that the defendant is summoned or any person held to answer.

The rules of law in relation to the commencement of actions do not seem to be applicable to the filing of notice in the clerk's office for the purpose of saving the lien.— The account, there filed, is filed merely as a statement of what the party claims, and not a statement of that, for which he would have a right to commence an action of assumpsit. It is made a condition of his right to sue.— The act of 1834 had a similar condition requiring the party to file his account, within three months after the last payment.

At the time of filing this account in the city clerk's office this draft was, it is true, outstanding and not arrived at maturity, but it is equally true that at the time of filing the petition, which is the first proceeding to enforce payment, it had been taken up by the petitioners and was in their possession. The right of action was then perfect.

The draft then being in the hands of the petitioners, at the time of filing their petition to enforce payment, dishonored and unpaid, and there appearing from the master's report no evidence of any agreement that the same should be in payment and discharge of the original debt, except the fact of its negotiation by the petitioners, and the presumption arising therefrom being rebutted by the fact that a lien therefor is to be given up, we think the petitioners are not debarred from recovering the amount and that they should not be compelled to credit it in account, but on the contrary, are entitled to have it allowed them.